Case number 17-7171, Archdiocese of Washington, Donald Cardinal Wuerl, a Roman Catholic Archbishop of Washington, a corporation sole appellant, v. Washington Metropolitan Area Transit Authority. Mr. Clement for the appellant, Mr. Verlin for the appellees. Good morning. Good morning, Your Honors, and may it please the Court. Paul Clement for the Archdiocese. I will endeavor to save a few minutes for rebuttal. The District Court erred in denying a preliminary injunction here. Although there are a number of issues on this appeal, two suffice to make clear that the District Court erred. Namely, that WMATA's Guideline 12 is both viewpoint discriminatory and a straightforward violation of the Free Exercise Clause. Guideline 12 straightforwardly bans advertisements that promote or oppose any religion, religious practice, or belief. Thus, while WMATA allows advertisements on a broad variety of subjects, including operating hours, tourist attractions, charitable giving, and Christmas, it excludes advertisements that address those topics from a religious perspective. But how does WMATA define the subjects? You are defining the subjects as like including Christmas, but I think what's operative is what the Guideline defines the subjects as. Well, two things, Judge Wilkins. First of all, I think that at some level I agree with you that the fact that Guideline 12 expressly discriminates against religious speech is ultimately what matters. But in terms of figuring out what is the topic for analysis, the Supreme Court cases teach us directly that for those purposes what matters is the topic the speaker has selected to address and not the topic that the school or the WMATA seeks to allow or prohibit. And so let me use Lamb's Chapel as an example because I think that's the best example. In Lamb's Chapel, the Supreme Court said the relevant topic was child rearing. Now, why did it come up with child rearing? My friends at WMATA and the district courts seem to think it's because the school district in Lamb's Chapel had a specific policy saying child rearing can be addressed. But that's absolutely wrong. If you look at the opinion, what the school district did is it broadly said you can address social, civic, and recreational groups can come in and talk. But then there was a specific policy. Rule 7 that said you cannot address religious, you can't be engaged in religious activities. And that is why. What the case, what the court said is that, quoting I think it was Rule 10, said the property could be used for social, civic, and recreational purposes. Right? Absolutely. And then it specifically focused on child rearing as a topic that would otherwise be addressable in the forum, but it couldn't be addressed because of the operation of Rule 7, which came in and said, nope, that's religious, you can't do it. So you can analogously here, you can say this ad that we're trying to run or the other ones in the record, like Walk with Francis or the Franciscan Monastery, they could be run on WMATA, but for the operation of Guideline 12. Well, then under, if that's the way we're supposed to analyze this, then Guideline 11 that says advertisements that support or oppose any political party or candidate are prohibited, that's viewpoint discrimination, too. I'm not sure that it is because I think, I mean, you know, I think my friends at the ACLU in another case may be arguing that. What's the difference between 11 and 12 other than it says political party instead of religion or religious practice or belief? Three big differences, Your Honor. Lamb's Chapel, Rosenberger, and Good News Club. We don't have any analogous cases from the Supreme Court addressing something like the political parties. So that's a harder question. It's a question for another case. As I said, I think my friends at the ACLU are litigating it. But what makes this case remarkably straightforward for purposes of giving us a preliminary injunction while the litigation proceeds is there are three on-point Supreme Court cases that address things that are directly analogous to Guideline 12. But doesn't Rosenberger explicitly say that you can have religion as a prohibited subject matter, that you could have, in effect, content discrimination but not viewpoint discrimination with respect to religion? But, Judge Wilkins, I think it's important to understand what the holding of Rosenberger is and what that dictum means. And I'm happy to address that dictum because I think it's an important dictum. But the holding of Rosenberger is a guideline. There was a guideline, too, that specifically said that otherwise permissible speech by wide awake, as the student publication there, was ineligible for funding reimbursement because it addressed a religious topic or did it from a religious perspective. So that's what you can't do, and that's what Guideline 12 does. Now, what Rosenberger in dictum says is okay is that a government can construct the rules for the forum in a way that renders the topic of religion non-germane. So, for example, if what Rosenberger had done, if what the UVA had done there is said, we're going to have a specific forum to discuss UVA sports. Well, if wide awake then tried to get reimbursement, it could not get reimbursement because the subject of religion was non-germane to the forum. But what you can't do, and what all three of these cases say is, look, we're going to have other rules for the forum, and then we're going to superimpose a rule that says religious speech or religious groups are subject for disfavored treatment. But we have to read the holding in Rosenberger, don't we, in terms of the fact that the university had placed no limitation and the student organization had otherwise qualified. I thought that was a key aspect of Rosenberger. But so too here, Judge Rogers, but for Guideline 12. There is no question in this case as it comes to this court that we can run our ad. So it is only Guideline 12 that takes it out of the forum. I know, and there was no Guideline 12 in Rosenberger. Oh, absolutely there was, Judge Rogers. What was it? There was. I mean, it was a guideline. They specifically referred to the guideline. The guideline in Rosenberger specifically says that it prohibits the funding of, quote, religious activity. And the organization that was seeking the funding was not designated, if I can put it that way, in any way different than the other organizations that were seeking funding. Do you view that as a significant aspect of Rosenberger? Well, I guess with all due respect, I'm not sure I fully understand. I think it's an important aspect of Rosenberger that the Wide Awake publication, but for the guideline that prohibited the reimbursement of religious activities, could otherwise run in the forum. But that's directly parallel to this case. Other than Guideline 12, this ad can run. It is only because Guideline 12 comes in and says no religion that this ad can't run. Are you going as far as the dissent then in the case involving the political ad that started this distinction between commercial speech and barring subject matter? I'm not going there, Your Honor, for multiple reasons, not the least of which is I don't have to. Because if this case comes to you, this ad is, I mean, we know why this ad was prohibited. It was not prohibited because it was an issue ad or because it wasn't sufficiently commercial. If you actually look at the guidelines, the guidelines don't distinguish between commercial and noncommercial speech. This ad was prohibited for a single reason, Guideline 12, that expressly discriminates against religion. What are the topics or subject matters on which you want to speak? Well, I would say that in this particular ad there are three subject matters we'd like to speak on. One is charitable giving. Two is operating hours. And three is Christmas. And those are the three things that we think this ad addressed. We think those are three things that unambiguously another organization could address from a nonreligious perspective. We have to look at what the record says, and the record says that the primary purpose of the ad was evangelism, right? That may be the reason we were motivated to address those topics. But I take the question to be different. If you think of Lamb's Chapel as being addressed to the topic of child rearing, what topics are our ads addressed to? I think it's clear if you look at Lamb's Chapel. I mean, you know, I don't think there's any doubt why that group, Lamb's Chapel, wanted to show Dr. Dobson's film series. They probably wanted to do it for a religious or evangelical purpose. In the same way, I'm not here to deny that the archdiocese of all people. Evangelism is a subject. I mean, it's not just a motivation. But here we weren't addressing just evangelization, and that certainly wasn't why we were refused. We were refused based on Guideline 12. I think the right way to look at this consistently with Lamb's Chapel, Rosenberger, and Good News Club is the subjects are Christmas, charitable giving, and operating hours or, you know, hours for events. And, again, I think if you look at this case, I mean, it's particularly clear on charitable giving because the Salvation Army is allowed to run an ad with the Red Kettle. But we are not allowed to run an ad that directs you to a website where one of the three things is give and it shows you ways you can give through Catholic charities and other charitable giving. Do you think speech about religion can be distinguished from speech about other subject matters from a religious viewpoint? I think that's a difficult distinction to draw. What I'm most confident of, Judge Kavanaugh, is that the government cannot simply say that a religious viewpoint or even a religious topic on otherwise allowable subjects is prohibited. I think if you look at the Court's cases, there are three cases that deal with something like Guideline 12, a provision that comes in and says whatever else you can do, you can't do religion. All three of those cases strike it down as viewpoint discrimination. Under a general policy that allows a forum to be used for a variety of things, you come in and say this is the subject matter on which we want to speak. Is that permissible to talk about that subject matter within the forum? And if yes, then you're allowed to communicate about that from a religious perspective. That's right. You can build up your rules about the forum and say this is just about transportation, this is about UVA sports, but you can't have a provision like Rule 7 in Lambs Chapel, like Guideline 12 here. I'm sorry to interrupt. What about the original motivation for this, which was the Prophet Muhammad ad? How would that fare under your position here? I don't necessarily think that ad would be protected by our position here, because as I understand that ad, I don't even think it was really being put in there for a religious reason. I think that ad was being put in there for a political reason. Our challenge here doesn't go to Guidelines 9 and 14 that address issue advocacy and take that out. We're focused on Guideline 12 for the obvious reason that that was the reason we were told that we couldn't run this ad. And Guideline 12, with all due respect, is blatantly viewpoint discriminatory within the meaning of those three Supreme Court cases, and there are no Supreme Court cases that are too complex. But the Supreme Court has consistently said that content discrimination or subject matter restrictions and viewpoint discrimination are two different things. They absolutely have. Viewpoint discrimination is a particular type of content discrimination, but that not all content discrimination is viewpoint discrimination. So are you saying that to decide this case, we can still maintain that distinction? Oh, absolutely. How? Just by citing Rosenberger, Lamb's Chapel, and Good News Club and saying, look, if WMATA wanted to come in and develop neutral rules for what goes in this formula, that don't discriminate on the basis of religious subject matter or religious viewpoint, they can do it. But what they can't do is say, here are the other rules of the forum. This adds other ones in but for Guideline 12. So if I had at my last Thanksgiving dinner, everybody, you know, the meal was spoiled because of arguments about the election, and I said, okay, this Thanksgiving, no one can discuss politics at all at the dinner table. Is that viewpoint discrimination? I don't know that it is. And I think that's a harder case because you don't have three Supreme Court cases that are on point. So if I had the same rule and I said, you know, the Christians and the atheists spoiled Thanksgiving dinner last year, so this year there's no discussion at my table of religion. That's viewpoint discrimination? I think it is within the meaning of Rosenberger. And I think the way you reconcile, and obviously Rosenberger itself says drawing this line is tough, and one blurs into the other, but the way you get around that at your Thanksgiving dinner table next year, if I may offer some advice, is to say, hey, look, this year, let's keep it simple. Let's talk about sports. Let's talk about the family. Now, if somebody wants to talk about sports and say their favorite team is the Fighting Irish because they love Touchdown Jesus, they can do that because they're still talking about sports. The fact that they sort of add a religious reference or even a religious viewpoint is fine. But to say, look, I don't want to hear you talk about religion and that means you can't even talk about sports with a reference to Touchdown Jesus, I think that's viewpoint discrimination. I thought, though, the point was here, there's to be no add about promoting religion, for example. There's nothing here in this record to say that your client couldn't run or wouldn't be allowed to run an ad saying charitable giving. Well, I do think there's something in this record that suggests that, which is this ad that was directed at charitable giving, we weren't allowed to run it. Well, it was part and parcel of an ad that was a religious ad promoting religion. Well, I think that to say, I mean, you know, if you want to look at other ads in the record as well, I mean, Joint Appendix 212. Just looking at this one. Well, okay, but, I mean, this ad was prohibited because of Guideline 12. I'm just trying to get you to focus on the promotion. In other words, the text of the guideline isn't as broad, I suggest, as you're arguing. You can talk about football, and if you want to talk about a team that has a religious, I don't see that. This is evangelism, which, at least in the record below, is viewed as promoting religion. With all due respect, Judge Rogers, I think that would only make it more clear that this is viewpoint discrimination and not subject matter. Because if it were the subject matter of religion, that's actually, as my colloquy with Judge Wilkins indicated, I think in this context, this kind of external prohibition is still going to be viewpoint discrimination within the meaning of Rosenberger. But I think if you want to say, no, no, the reason this was excluded is not because it addressed the subject matter of religion, but because you've crossed the line into promoting religion. With all due respect, I think you're making my job easier. Because then it's crystal clear it's viewpoint discrimination. And if there's one other thing that Rosenberger is crystal clear about, is that you don't avoid viewpoint discrimination by saying promote or oppose. That was the express argument they rejected. So I could give an endless list of subjects on which there could be speech, but I can't just say I'm not going to spend the whole hour listing all these subjects. I'm just going to tell you you can't speak about promoting religion. That would not be permitted. That would absolutely not be permitted. And is it because religion is in a special category here as far as the First Amendment is concerned? Well, I think it actually ultimately is, because the First Amendment includes not just the free speech clause, but the free exercise clause. But the other reason I think, with all due respect, it's a special category, is because these three cases make this case easier than the hypothetical about no political speech, which I think is a much harder case. And again, I do think if you think the reason this ad was excluded was because not just that it addressed the subject matter, but that it promoted, then that makes it more obvious it's viewpoint discrimination. And the fact that it says promote or oppose is the one thing Rosenberger says doesn't save it from being viewpoint discriminatory. The district court found that the Salvation Army ad did not promote or oppose religion, whereas your client's proposed ad did. What standard of review do we apply to that finding? You know, I think it's a mixed question of fact and law. But, you know, I think on this record, I mean, you know, I think the one thing I will say is even if it's clearly erroneous, one thing the district court said is you don't see the Salvation Army mission statement, which references Jesus, until you do a couple of clicks. And that's just clearly erroneous. I mean, you can do it for yourself. Right there on your landing page, there's the mission statement that refers to Jesus. And, obviously, there's a reference to Jesus on the landing page of the findtheperfectgift.org website. I think, you know, our reference to Jesus is a little more prominent, I suppose. I mean, you know. That just goes to arbitrary enforcement. If it's treated as a secular ad, the Salvation Army one, that supports your point that they're allowing secular ads but not allowing religious ads on the same topic. That's exactly right. And I think that's why the United States in its amicus brief focused so much on the differential treatment between the Salvation Army and the findtheperfectgift.org advertisement, because I think it's a nice, specific application that illustrates the differential treatment. I do think, however, that, you know, although I think that does illustrate the problem, I do think the problem is with Guideline 12. It is rotten to its core, would be our position. It is invalid on its face. There's plenty of ways for them to deal with the problem they're dealing with. Any time the government tries to limit speech because they don't like the reaction to speech, they're getting into difficult territory. But I think the one lesson from the case is you can't take the easy way out and say, none of this promoting or opposing religion. Can I ask you about the other prong of the test, which is in a limited public forum, it has to be reasonable, not just viewpoint neutral. How do we analyze the reasonableness prong, and is that distinct from equal protection and free exercise in any meaningful way? Well, I think it can be distinct from that in other ways. Let me say a couple of things about that, if I may. One is we don't concede that this isn't a public forum. I know there's some back and forth about that. About that, too. But let's get to the reasonableness first. Okay. I just don't want to say a word about forum without saying we didn't concede it. I'll give you time on public forum. Okay. Formal district court judge, you're swimming way upstream with that. Can I talk about reasonableness since I had the question on reasonableness? And I understand, which is maybe why I didn't start with it, Your Honor. But in all events, as to if we assume for a second, arguendo, that this is not a public forum and that it is a limited public forum, as I think I'm using that term correctly, though these terms are difficult. Limited public forum. Right. Then as your question suggests, you have to both avoid viewpoint discrimination and you can't have unreasonable restrictions on the forum. So I would say, you know, there are ways in which the unreasonableness of these restrictions, which we very much think they are unreasonable, map onto principles of free exercise clause and the like, which is, you know, I think the easiest way to say this, and this is really what, say, Justice Scalia said in his concurrence in the Good News Club case, is given the free exercise clause to simply say, the one thing we're not going to allow in this forum, although we allow a bunch of stuff, we're not going to allow any religion, that's unreasonable in a constitution governed by the free exercise clause. It never can be reasonable to say we're excluding religious speech or religious speakers because of religion. No. I don't think that will ever be reasonable. But I also think there are independent reasons why there's a reasonableness problem here, and I would just focus on two. One is, you know,  forum. The purposes of this forum, as I understand it, are to raise money. And in that context, to prohibit every religious speech, I mean, that doesn't seem particularly reasonable. Then the second argument along those lines. Based on that, they're concerned about rider reaction. I guess the original genesis of this was the Prophet Muhammad ad, and then surveys where riders said, we don't want to be bombarded with religious ads and other ads that we don't like. So does that make it more reasonable? Is that something we should take account of? Or how do we factor that in? Well, that segues into my second sort of case-specific reason why I don't think this restriction is reasonable, which is those rider surveys they relied on did not say a word about religious ads. They talked about issue ads. People didn't like issue ads. So what did WMATA do? They went out and they banned issue ads and religious ads. And it's that second part that there's really no evidentiary justification for. And when we're dealing with both free speech and religion, with all due respect, I don't think that's good enough for government work. I think in this context, if you were going to take that step, you would need to have evidence that went specifically to the idea that religious ads, all religious ads, were so, like, you know, And there's no record for that. But I do think, to be clear, that even independent of that, as Justice Scalia suggested in his Good News Club concurrence, there's, like, a more fundamental problem with having a restriction that just says no religious speech. That's just per se not reasonable under the Constitution with the opposition. But it would be reasonable if this were government speech, right? So, I mean, one of the fundamental divides here, confusions, is if this were government speech, the government can express viewpoints and can remove religious symbols, say, from the town square if it wants. But once it becomes private speech and there's a forum, the government can't say no religion into the square. That's absolutely right. If this were the government, if it were Metro itself running its own promotions, it wouldn't have to include religion. Absolutely not. And WMATA guards against concerns about mistaken endorsement and that by making clear that the ads have to be clear that this is private speech, not government speech. So we're far, far removed from the government speech context here. But I absolutely agree that once you're in the government speech context, then the government has a much freer hand. And, you know, that's why, for example, we continue to rely on the Byrne decision from the Second Circuit as having a helpful analysis of what's viewpoint discriminatory. But that decision, although it's analysis on viewpoint discriminatory, remains good law. The bottom-line conclusion there is probably no longer good law because license plates, thanks to the Confederates, some of the Confederacy case are now considered government speech. But I don't think there's, you know, I can't predict what Mr. Verrilli will say about a lot of things, but I can predict he's not going to get up here and say this is government speech. Right, it's just if you look at the record, one of the sources of confusion Metro seems to have is they were concerned about audience reaction in attributing this private speech to Metro. But that's not government speech, so it's not that bucket of the analysis. No, and nor would this be a reasonable response to that problem. I mean, if that's the problem, then, you know, more prominent disclaimers or perhaps, you know, a brief educational session on the nature of government speech and non-governmental speech. It sounds very much like the dissent in Lehman, that once WMATA decides to have this commercial activity, all comers have to be accepted. Well, a couple of things about Lehman, Judge Rogers. I mean, the first thing is Lehman is certainly not good authority for the idea that government can have something like Guideline 12 that discriminates against religious speech because if you look at Lehman, they allowed, even on the inside of the street codes, they allowed churches to, that was one of the allowed uses. It was only political speech that they kept out, and that's another reason why the prohibition on political speech is a harder issue. But there's just nothing in the Supreme Court cases that supports the idea that a government can have something like Guideline 12, and certainly Lehman does not support that proposition. Lehman's obviously also a plurality opinion. If we're going to go to the realm of plurality opinions, I would sort of, you know, see your Lehman and raise you Metro Media, which says there are actually problems with a clear distinction between commercial and noncommercial speech, but, of course, that's not the policy. We'll not adopt it. And that, too, would be a harder case. If they came up here and said, you know, all right, we've seen the light. We're going to get rid of Guideline 12, but what we're going to do is going forward, we're only going to allow commercial speech and not noncommercial speech, and if that were the basis in some future policy that they excluded this ad, I would be back here, but I'll have a harder case. But this case is so much easier than that, because Guideline 12 is the direct analog of Rule 7 in Lanschapel, the Guideline in Rosenberger, and the same rule in Good News Club, because Good News Club comes out of New York, so it's the same policy as in Lanschapel. On public forum and Lehman, you argue that this should not be considered, in the alternative, you argue that this should not be considered just a limited public forum but a public forum. So Lehman's about the interior of the bus. How does the exterior of the bus differ for purposes of public forum analysis? I think there's two principal differences. One is you don't have the same captive audience problem, and two, it's visible from quintessential public fora. And so the inside of a bus I don't think anybody thinks is a quintessential public forum, but the streets and public sidewalks are a quintessential public forum. So I think this case actually poses a relatively difficult. If that position were correct, then political ads would, of course, then have to run on the sides of the buses, the exterior. That is absolutely right. And so there is a difference, and that's why below we urged the court that it didn't need to decide this issue, and we don't think you need to decide this issue. I do think, though, and we put this in a footnote in our opening brief. I mean, I think the analogy here is the right analogy, and I think it's quite a difficult issue, which is if you had a billboard in a public park that the government purported to restrict, is that a traditional public forum because it's visible from the public park, or is it a limited public forum because the government has said we don't want any political speech on that billboard? It's a really hard question. I think it's the analogous question here. I think, fortunately, you don't have to decide it, because this is viewpoint discrimination under the clear teaching of three Supreme Court cases. All right. Thank you, Your Honors. Good morning. Good morning, and may it please the Court, Don Verrilli for WMATA. Since we raised mootness, let me just take one second on that, and then I'll get to the merits. We raised it because we thought the Shalala case required us to raise it, but now our friends on the other side have said that they specifically intend to ask to run this exact ad in the next advent season, and therefore we think this is a case capable of repetition, yet evading review, and therefore not moot. And so now turning to the merits, let me go right to the heart of the matter on viewpoint discrimination. The key consideration under viewpoint discrimination analysis is the baseline that is set by the lines the government draws when it creates its forum. Now, in the cases that my friend, Mr. Clement, relies on, Lanschapel, Rosenberger, Good News, the government deliberately chose in each of those cases to create an open forum for discussion of matters of policy, ideology, and public welfare. And if you look, for example, at page 825 of the Rosenberger decision, the Court says specifically that what the University of Virginia was trying to do was encourage the expression of ideological views, including those that are controversial and not widely accepted. But you heard counsel's pushback when I tried to focus on the context of the holding. He's reading the case simply on the holding, ignoring whatever else was around. Well, I think even with respect to the holding, Your Honor, I think with respect to each of those cases, the situation was, and the context was critical, and the holding, of course, is embedded in that context. In each of those situations, the forum was widely open for discussion of a huge range of topics. And if that's the baseline, a decision to exclude- But then the party that wanted to speak came in and said, here are the specific topics we want to talk about. Those weren't listed in the general policy. So child-rearing in Lanschapel, character and morals in Good News. And then said, we want to speak about that topic. Is that topic permissible to discuss within that forum? Answer, yes. Okay, then we want to speak about it from a religious perspective. So, too, here, they want to speak about charitable giving and Christmas. And so I'll ask you, are those topics generally permissible to discuss in this forum? I'll answer Your Honor's question directly, but if you'd permit me to make a more general point first. Sure. Because I think actually the key to this case is that the forum here is basically the opposite of the forum. The choice that WMATA made is basically the opposite of the choice that the government made in Rosenberger and Good News. Well, it doesn't really matter how broad or how narrow. The question is the subject matters they want to speak about. Are those subject matters permitted to be discussed in this forum? So is charitable giving and Christmas permissible to discuss in this forum? Christmas is not a subject that's permissible to discuss in the forum in the sense that whether the speech was religious- Do Christmas ads in this forum? You can do ads for commercial products in this forum. That reference Christmas? That reference a holiday season or Christmas, yes. Did you say find the perfect gift, Macy's.com? I think you could if you then clicked, if you then went to the URL and what you saw was a photograph of a toaster or an espresso machine, yes. Right. But that's not viewpoint discrimination. And I think the key- To allow a secular Christmas ad and not a religious Christmas ad is not viewpoint discrimination? Because the secular ad is a commercial ad to promote a product. The findtheperfectgift.org ad is an invitation to worship. The Archdiocese itself describes it as proselytization. It is not within- That's the exact argument that was in Good News and Land's Chapel and Rosenberger, that there was a distinction between religion as a subject matter or religious worship on the one hand and religious viewpoints about other topics on the other. And what Rosenberger said was you can't divide those two things, that religion, sure, it's a subject matter of inquiry, but it also provides a perspective, a standpoint, a specific premise from which a variety of subjects may be discussed and considered. And that's why you have to look at what is the subject they want to discuss. But, again, I think the key difference in Rosenberger was that in Rosenberger, the forum was open so that there could be debate by student organizations about birth control and abortion and gay rights and a whole range of topics. You just couldn't discuss those topics that were otherwise open to the forum from a religious perspective. So, too, here you have charitable giving that's allowed from a secular charitable giving perspective but not a religious. Ads that reference Christmas from a secular perspective but not a religious. Let's break those down. Charitable giving? I don't think that's right, Your Honor. I think the Salvation Army ad proves that that's not right. If the Archdiocese wanted to come in and run an ad that said, please give to Catholic charities, that would be like the Salvation Army ad. The fact that it was a religious speaker would not exclude it from the forum. It would be included in the forum for the same reason. But that's not what this ad does. Yes, it has charitable giving. That ad would be allowed? Yes, it would be allowed. And as Judge Rogers indicated. How is that different from find the perfect gift? Well, because find the perfect gift, when you follow the link, you go to the URL, what you find is an invitation to worship, an invitation to embrace Catholic principles, and included in it is a charitable giving request. But it's embedded in a context in which when you click on it, that's the message you get, and it's the message they intend and it's the message everyone understands. And we think that's a fundamental difference. Now, with respect to the subject of Christmas, if somebody wanted to run an ad saying, look, there's a war on Christmas, we would reject that ad. If somebody wanted to run an ad saying the war on Christmas is overblown, we would reject that ad. If somebody wanted to run an ad saying Christmas has become too material, we'd reject that ad. If somebody wanted to run an ad saying celebrate Kwanzaa instead of Christmas, we'd reject that ad. And the reason for that, Your Honor, is because if you look at our policy, I think that That wouldn't be on Guideline 12. Well, the key, yes, but the key thing Am I right, that would not be on Guideline 12? I think probably the last one would be. Of my examples, the others probably wouldn't be. But I think the key thing here is that you have to look at the policy as a whole because the baseline matters. And if you look at JA 206, you'll see the policy is that unlike, and I think just in distinct contradistinction to the forms at issue in Rosenberger and Good News and Lamb's Chapel, what WMATA did here, based on its experience, was make a judgment that it was going to close the forum to all issue-oriented advertising, including political, religious... I think that's a bit of a distraction, but correct me if I'm wrong. Here's why I think it's a bit of a distraction. You have all these other guidelines that may exclude a particular ad. But if a proposed ad makes it through all the other guidelines, then you get to Guideline 12. And Guideline 12 is going to say you're in if you're not religious and you're out if you're religious. And so Guideline 12 is doing all the work for that subset of ads that make it through the other guidelines. You're in if you're promoting or opposing religious belief or practice. And that is one of the... And that is in the bucket of ads that WMATA has decided that as a categorical matter, give rise to the kinds of contention and divisiveness that it is trying to avoid having occur. Suppose, and I know how you're going to answer this hypothetical, but I want to use it to explore your position. So a policy that says no advertisements that promote or oppose Judaism, any Jewish practice, or any Jewish belief. Constitutional or unconstitutional? I think that that would be unconstitutional. Why is that different from religious religion, any religious practice, or any religious belief? Well, because in that situation, I think it goes back to the baseline. In that situation, discussions promoting or opposing Christianity or Islam or any other religion would be in the forum. Right. Okay. And here's the problem, which I see at the heart of this. One of the two problems at the heart of this, which is it is believed that discriminating against all religions is okay. Discriminating against individual religions, not okay. But the Supreme Court has said that's wrong. That to discriminate against Catholicism, Protestantism, Mormonism, Islam, Judaism, as a class, is discrimination against religion. And that, in the words of the Chief Justice last year, for six Justices, is odious to our Constitution. But I think the right way to think about this, Your Honor, is that we understand, we acknowledge, these topics are important topics for discussion in our society. We understand that. But WMATA is running a transit system. Its goal, its mission here is not the mission of the- No, it's running a public forum. You can't get out of this by saying, oh, we're just a bus company. Once you open it for private speech, not your speech, Metro could do whatever it wants as its own speech. But once you open a forum for private speakers, as the Chief Justice again said last year, the idea that you can say no churches need apply is odious to our Constitution. Well, we don't say that, of course, if a church wants to- No church that wants to promote its belief can get a spot. They're excluded because of their religion. So I do think, Your Honor, that the starting place for the analysis here is that this is a, whether you call it a limited public forum, non-public forum, whatever the nomenclature is, that's what it is. That means, by definition, that the government is entitled to make content-based categorical judgments. And the content-based categorical judgment that the government made here was that it was going to exclude all issue-oriented advertising. That's different. The issue ads are different from Guideline 12. You could ban issue ads, and the ACLU is going to be litigating that in the other cases. That's fine. But then on top of that, you have the ban on religious ads. So I know why you keep folding it back into the issue ads, and I would do the same thing, but I just don't think that gets you. So I do think because they hold the potential, just like ads about politics or just like ads about social issues like abortion or gay rights, they hold the potential to create the kind of divisiveness and disruption that WMATA is trying to avoid because that is incompatible with it carrying out its mission of running an effective transit system. And that is true whether the ads are religious or not. What would happen on an effective transit system if you ran a religious ad? The buses aren't effective anymore? I don't get that. So this is obviously a benign ad, but we have to make categorical judgments about categories in order to avoid claims of viewpoint discrimination, and the avoidance of viewpoint discrimination is a high bar. And so with respect to this ad, fine. But if you look, for example, at J.A. 268, you'll look at an ad that once ran when WMATA was an open public forum, which was an ad very critical of the Catholic bishops. That was a highly contentious ad, and the way in which it affected adversely the operation of the transit system is it's damaging to the morale. It's damaging to the morale, for example, of Catholic employees who may be driving the buses. That's a reason to close the forum. This is the problem. Once government opens a forum for public speech, guess what? There's going to be some offensive speech in there. Respectfully, Your Honor. That's what the Supreme Court has said in the Mattal case last year. It said giving offense is a viewpoint. Of course, Mattal was not a forum case. But it talked a lot about viewpoint discrimination. It made clear that giving offense is itself a viewpoint. It made clear in very strong terms in both four justice opinions that the government can never say, oh, because something is deemed offensive by society, we can remove that from the public square, that private speech from the public square. Well, I think, Your Honor, that that was exactly the basis on which the policy at issue, the transit policy at issue in Lehman was upheld. And the language now, admittedly, it's a plurality opinion, but I do think Justice Douglas agreed in all respects with this aspect of the opinion. So it carried five votes, and courts of appeals for 40 years have been applying it as though it were the law. It was specifically, specifically what the court said in that opinion was that the transit authority does have the discretion to limit its forum to innocuous and non-controversial commercial and service-oriented advertising. They allowed religious speech. They allowed church ads. But they, I do wonder if I might just digress for a second, and I'll come back to you, just to go back to a question that you asked, Judge Wilkins, about the political ad. Lehman answers that. Lehman was a political ad, and the court held that that advertising could be categorically excluded. And certainly, religious speech is of very great value under the First Amendment, but it's not of greater value than core political speech on the subject of who should be elected to office. And the court held in Lehman that that core political speech could be excluded. And so I think on the case law, what I understand that to be is you can wall off politics as a subject matter. And your point would be we can wall off religion as a subject matter. And the problem I have with that are the cases, the three cases that say you can't really distinguish religion as a subject matter from a religious viewpoint once you identify another subject matter. So I'm going to read from Good News. We disagree that something that is quintessentially religious or decidedly religious in nature cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint. And then it quotes Judge Jacobs, when the subject matter is morals and character, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters. What do you think we should make of that language in the Supreme Court? I think the critical point there, and what I think the court is saying, is that once the government has made a choice to open the non-public forum to speech on the topic of child rearing and morality, it cannot then say, but you can't address that topic from a religious perspective. And that's the fundamental difference here. This is essentially a forum that is open for advertising for commercial products and services. Essentially is the key word there, because that is not correct. It is not just commercial. It's not just commercial, and service-oriented public service ads. But the line is, look at 206 and the guidelines, including Guideline 12, implement the policy judgment that's there at JA 206, that it's taking off the table all issue-oriented advertising because the potential for division and contention is incompatible with the effective operation of the transit system. That's the judgment they made. That's the judgment that they are allowed to make under the law. And that's why the baseline is so critical. I think the key is whether you can identify a topic that is permissible within the forum. Do you agree or disagree with that? I think, yes, but the question is how. And I think what you do is start with the lines the government had drawn. After all, Rosenberger, quoting Cornelius, said that the key here is that the government has to respect the lines that it itself has drawn. And so what you've got to do is start with the lines the government has drawn. And the line the government drew here excludes all issue-oriented advertising with religious advertising as a subset. And the key difference in all of those cases is that the lines the government drew created a forum designed to encourage wide-open, robust, and uninhibited debate on public issues and issues of importance. The forum here is designed to do exactly the opposite because that kind of wide-open, robust debate, we think on the side of a bus or in the metro cars, is detrimental to our ability to operate effectively. And I do think, you know, I understand that my friends on the other side want to cabin this to religion. But several things about that I think it's important to understand that there just is no limit to the argument my friends on the other side are advocating. With religion itself, if we run this ad, if we run the Find the Perfect Gift ad, it seems to me there is no argument available to us that we could foreclose running the ad, which you can see at page 268 of the Joint Appendix, criticizing the Catholic Bishops. Because if we run an ad promoting the Catholic faith, viewpoint discrimination, viewpoint neutrality, would require us to run an ad criticizing the Catholic faith as well, which would then in turn require us to run an ad criticizing Islam or criticizing Judaism, and we'd be in exactly the situation in which we are trying to avoid, and in which the Supreme Court in Layman said we had the constitutional authority to avoid. And it isn't, you just can't limit that principle to religious speech. For example, if we run an ad for the Dodge Ram 1500, then somebody can come in and say, well, you know, you're encouraging low fuel economy, so the NRDC can come in and say, hey, climate change is a big problem, and you should not be, and we should be paying more attention to fuel economy. This isn't hypothetical, you know, we run ads for McDonald's, and we have been sued by PETA. Even if we were to accept that argument and say that, well, on its face, this isn't viewpoint discrimination, what about the contention that, well, as applied here, it's viewpoint discrimination, because the Salvation Army ad was allowed to run and this one wasn't? So two answers to that. First, there is a fundamental difference between the Salvation Army ad and this ad, in that, as we said, if the Archdiocese wanted to run an ad that's essentially equivalent to the Salvation Army ad, we would run it. So we don't think that there's discriminatory application here. We don't think that the argument about the yoga ad is really a very serious argument with respect to discrimination. So I don't think you have a record on which you could find and impose a preliminary injunction that there's discriminatory enforcement here. But beyond that, I think the critical point is, anytime you're operating in a situation where there is a non-public forum, the government has the authority to make categorical content-based judgments. That means some things are going to be in and some things are going to be out, and that in turn means that some things are going to be close to the line. And it can't be right that the government has to bat a thousand in making those judgments about what's on what side of the line to avoid the claim that it's engaged in viewpoint. And as applied to tech, we don't care whether they bat a thousand generally. We care whether they got it wrong this time. Well, right. But I guess what I'm saying, Your Honor, is that even if you thought we got it, there's two ways of looking at it, right? One is that we got it wrong because we should have run this ad in addition to the Salvation Army ad. The other way would be, of course, that we got it wrong and that we shouldn't have run the Salvation Army ad either. And I guess that's why I'm saying that even in an as-applied context, before you would decide that there was discriminatory enforcement, I would hope the court would want a much more robust record as you have here. And I do think that's a serious problem, both with the as-applied and also with respect to the general challenge here, in that my friends on the other side are making an argument that, you know, just look at this. All these ads would be in, but our ad would be out. But they're all just one hypothetical after another after another. I mean, that's true. But on the general policy, that was the same point in good news that was raised at oral argument in good news, that we didn't know what the Boy Scouts really did at their meeting, and the counsel argued that the record was underdeveloped. But it was accepted that you could discuss character and morals in the forum, and that was good enough for the Supreme Court. And here it's accepted, you've said, that you can have ads on charitable giving and that reference Christmas. And so the question really is whether that topic is something that can be referenced from a secular perspective and not a religious perspective. You might disagree with the phrasing, but there's no doubt. You're not disputing. Let me just get this nailed down. You're not disputing that charitable giving ads are permitted on the buses? No, we're not. That's all I need on that. But you can add to it, but let me get the other one out, which is you're not disputing that ads promoting products and that also reference Christmas are permitted? That's correct. But with respect to charitable giving, I think it really would depend on the content of the advertisement. Right. An advertisement just promoting charitable giving, certainly in. Sorry, go ahead. Please, Your Honor. Go ahead. And with respect to products, it's in the category of commercial advertisements, which we accept. But an advertisement to come worship is just not in the category of commercial advertisements. It's not in the category we accept. And if we came back. The worship, I mean, that is Widmore. There are other cases which talk about worship. In Rosenberger, the Supreme Court, when talking about Widmore, this is an exact quote from Rosenberger. The dissent fails to establish that the distinction between religious speech and speech about religion has intelligible content. You're saying it does have intelligible content, but the Supreme Court in Rosenberger quoting Widmore said, no, it does not have intelligible content. No, I just think this is quite a different context. Here, what you're talking about, the kinds of ads we accept are commercial ads and service-oriented advertising. That's what we accept. If we came back with a policy that just said, didn't have the. Basically, one of the issues here is we're. This is a policy that defines out what can be said as opposed to defining in what can be said. But I think the key thing here, and this is a critical distinction from Rosenberger, Lamps Chapel and Good News, is it defines out a huge range of expression. What is defined in is a narrow range of expression. And so in that respect, it's really the polar opposite of those cases. And I just think I'm going to be repeating myself. But just on that point, I'm not sure that matters, the broad or narrowness of what's out. It might be a lot out. It might be very little out. What matters is what is in, whether that's small or large. And then you figure out within what is in, what topics are permissible. And you've said what you've said about what topics are permissible. And then the question is, once you have those topics that are permissible, are you allowing a secular ad and not a religious ad, regardless of how much else is excluded, a lot or a little? So I'm not sure that, I think I'm saying what I said before. But I'm not sure the broad, narrow thing really gets us very far. I do think it gets, I do think it's important. Because the question is whether when one of the subject matters that is excluded is the subject matter of religion. Does that operate to create a viewpoint discrimination? And doesn't Rosenberger say, yes, it does, because it is a subject matter, but it is also a perspective, a premise, a standpoint? It does if it operates to preclude speech from the religious perspective about subjects that are otherwise open for discussion in the forum. And is that this case? The charitable giving and the ad? Well, I don't, with respect to charitable giving, no, because the charitable giving alone isn't. Charitable giving alone is in. Charitable giving as part of an overall message of proselytizing is not in, because the message of proselytizing is there. And so, and that's the difference. And then with respect to Christmas, again, the subject matter of Christmas is not an available subject matter for this forum. And there are all kinds of discussions about Christmas that can't take place. Christmas-themed ads are permitted. Christmas-themed ads for commercial products are permitted. I mean, yeah, for commercial products. Right, for commercial products. And so, you know, I suppose if a religious organization wanted to sell a commercial product, if the Trappist monks wanted to sell chimae ale, holiday brew ale, they would be able to do that. Because it's not based on whether the speaker is a religious organization. It's based on whether the subject matter is within the forum. And so, and, but proselytizing is not within the forum. It is, and I do think that that's the critical difference between Rosenberger and Lamb's Chapel Good News. Can I just get you to clarify something? The commercial guidelines that were amended that appear at JA 208 say they are guidelines governing commercial advertising. So, do these guidelines apply to service-oriented ads as well? Yes, it's my understanding that these guidelines are comprehensive. So, they apply to every ad that gets submitted, these guidelines would apply to it. And I realize I've overstayed my welcome. I have some more questions on the other topics we haven't covered. May I make one more? I just want to go back, though, before you get to a new topic. What's your response to the notion that the Salvation Army ad says, give? It doesn't say to what. Yet, you, in response to a question, said it would be permissible under the policy to run an ad by the archdiocese saying, give to Catholic charities. Why isn't that promoting the Catholic religion or, you know, whatever religion? Because we don't think that it's an ad that promotes or opposes religion. It's an ad encouraging charitable giving in the same way that the Salvation Army ad is. That doesn't have the limit of a service or a commercial product. Well, we think it's service-oriented in that sense, that it's trying to encourage charitable giving, which is a good thing irrespective of its religious or non-religious motivation. So, is the assumption that the charitable giving to the Salvation Army will only go to Christian charities? Well, I don't know where it goes. It goes where it goes. I know, but I thought it was an interesting notion. And when you said Catholic charity giving would be permissible, then it seems to me you're getting very close to what you and Judge Kavanaugh are discussing, aren't you? Yeah, we don't see it that way. We see that as a neutral application of the guidelines because it doesn't cover anything. If I could just go for a minute to the question of whether this is a non-public forum. Can I, before you get to that, get to the reasonableness prong of the First Amendment test, which also blends, I think, into equal protection and free exercise? So, putting aside the intricacies of viewpoint discrimination, why is it ever reasonable for the government to exclude a religious speaker or religious speech from a limited public forum because of religion? Why is that ever reasonable? Well, if the government makes a judgment that, as it did here, that categories of speech that contain the potential for divisive, contentious dialogue and debate is inconsistent with the purpose of the forum, then... Is all religious speech of that nature? No, but we have to make... Could you have separate categories that prohibited incitement? And if the religious speech qualified as incitement, it could be prohibited. But here you're prohibiting all religious speech because it's religious. Because it's religious. And the Supreme Court has such a long line of cases, McDaniel and Smith and Lacoumie and Trinity Lutheran. The exclusion of Trinity Lutheran from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution. Right. That's six justices last year. Singling out of imposing special disabilities on the basis of religious views or religious status. You can't do that. That's Smith. Denying a benefit solely because of his status as a minister. That's McDaniel. Not discriminating against some or all religious beliefs. That's Lacoumie. I am not aware of any case where the Supreme Court has said you can discriminate against someone, religious speech or religious speaker, because of religion. No case. No case has said that. And all of these cases were more difficult because you had an Establishment Clause issue at the back end with the schools and the funding. There's no Establishment Clause issue at the back end here. This is just pure discrimination without the back end Establishment Clause defense. And I just don't know. I'm stating my view on this. But I don't know how you read those cases and say, here, it's because of religion. And you rightly go to the incitement. I understand that. But you have separate guidelines that can do that. Guideline 12 is because it's religious. Because it's religious, we're going to exclude it. I've never seen anything like that in any Supreme Court case outside the setting where there's an Establishment Clause issue. I appreciate Your Honor's point. But I disagree with it in numerous respects. First, that this is not discrimination against anyone because of their status as a religious organization. Because of their religious speech. Certainly not because of their status. I said religious speech or religious speaker each time I said it. So one of the two. It certainly isn't status. It applies to everybody. It applies whether you want to promote or oppose religion. So there isn't that kind of status-based judgment here. And with respect to the speech, I think this speech is, as you repeated yourself before, I guess I'm going to do it again. It is a subcategory of issue-oriented advertising. And that is the kind of judgment that if this is a non-public forum, which it is, that WMATA has the authority to make. Certainly we could have adopted an incitement standard. But there's two things about that. One is that the incitement is a very high bar under the First Amendment. It wouldn't exclude, for example, the ad that's at page 268, which we think causes the kinds of problems that are inconsistent with our ability to operate effectively. It's the ad attacking the Catholic bishops. And so it wouldn't exclude ads like that. So it doesn't accomplish the objectives that we're trying to accomplish here of creating a space that, and I think the Thanksgiving dinner table is a good analogy. We're trying to create a space in which the kind of divisive, potentially divisive, robust debates that ought to occur in other places don't occur in this forum. Because we have learned through hard experience that allowing those kinds of debates to occur in this forum are inconsistent with our ability to operate effectively. And that's, and I think that's a judgment we are entitled to make. That is not discrimination against religion. That is a judgment about what kind of speech we want to have in this forum that is very, very limited. It's a very limited category of speech in the forum. And religious speakers, if they are speaking about those permitted categories, can speak. So it's not, it's not. On the divisiveness, I mean, McCall last year, Justice Kennedy said, the government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience. So why does the reaction of the speaker's audience matter? Well, because that wasn't in a public forum context, Your Honor. And in a public forum context, the government does get to make these kinds of judgments. That is precisely, with all due respect, what the Supreme Court held in layman, that the government could make the judgment to avoid the kind of giving offense that the political ad might do on the bus. But on the, McCall's not a public forum case. He's talking more generally about First Amendment principles there and says, court's cases have long prohibited the government from justifying a First Amendment burden by pointing to the offensiveness of the speech to be suppressed. And so, and another place I think that is a public forum context that shows that that principle is more limited than I think Your Honor's question suggests is Cornelius, of course, which is really the foundational case in this area. The very argument that was made against excluding the charitable solicitations in Cornelius by advocacy organizations like the NAACP was that inclusion of those kinds of organizations in the charitable giving under the combined federal campaign was going to create controversy. Some people would be offended by that. It would diminish the overall effectiveness of the program. That was the very reason that was given for drawing the line that was drawn between charitable organizations that provide direct services to people versus charitable organizations that engage in advocacy. The court said that was fine as a categorical matter, even though it was about controversy and about giving offense. And that is because when you're talking about a non-public forum, you are operating under a different set of principles than applies. If this was a park, a traditional public forum, of course that principle would apply. Of course it would apply. And if it's a public forum, why is the exterior of the bus not different? So I'm switching to that. The public forum, why is the exterior of the bus not different from the interior of the bus? And Justice Douglas' opinion, which was the deciding vote, seemed to rely, although it's murky, on the captive audience point. So may I make a preliminary point and then I'll come back to it? I do think if the court looks at JA 420, you will see in black and white that my friends on the other side did concede that this was a limited public forum. This is a limited public forum. It's not a general public forum. I mean, we'll look at that. But they preserved it, I thought, at each stage. But in any event, we'll figure that out ourselves. On the question of the exterior of the bus, why is that not different from the interior of the bus for purposes of Justice Douglas' deciding vote in laymen? So I think with respect to the plurality first, the plurality relied on an old Supreme Court case, Packer, which was about billboards. So it obviously was including in its analysis speech that could be seen out in the public generally. So I don't think you can get that distinction. I agree. That's a good point for you. But I do think Justice Douglas' point seemed to rest, it's unclear ultimately, in the plurality on rest might be too strong. But it seemed to note the captive audience point. Sure. And that's one of the considerations. But I do think you've got to measure the reasonableness of the – I think in thinking about the right way to think about this, whether it's a traditional public forum or a non-public forum, you have to think about the government's interests here. And our interests, the interest in the ridership satisfaction and the employee morale and the administrative burdens and the vandalism and safety risks, all of the justifications for adopting this set of restrictions to close the forum in the way that we did, all of those apply equally whether the ads on the outside of the bus or on the inside of the bus. Well, part of the argument, there was a comparison to loudspeakers in the bus, and Justice Douglas made that comparison and said you can't avoid seeing the ads in the bus, just like you couldn't avoid a loudspeaker. Now, the dissent, Justice Brennan's dissent before Justice just took that apart but put that aside, when you're on the exterior of the bus, you're not forced to look at it. It's more like a picket walking down, one could say, and tell me why it's not correct. One could say it's more like a picket, someone walking down the sidewalk with a sign, it's the same as the bus moving down the road with your sign. How are those two things different? Well, they're different because they're different in numerous respects. The ad on the outside of the bus can have the same adverse effect on employee morale as the ad on the inside of the bus. The ad on the outside of the bus can create the same serious administrative headaches as the ad on the inside of the bus. We're going to get the calls from the archbishop and from the members of Congress and from the leadership of the city government here when we run an ad like the ad on page JA-268 on the outside of the bus or whether we run it on the inside of the bus. That's because you think those ads will be attributed to you. No, because whether they're attributed to us or not, they're on the bus and that makes a lot of people unhappy. And I do think that gets to a fundamental point here, which is that, you know, that at the end of the day is what layman is all about. Basically, if the court were to conclude that advertising on a bus is a designated public forum such that it could not have any content-based restrictions on what is accepted or even if it were to adopt what we think is a viewpoint discrimination that has no limits and effectively turns every non-public forum into a designated public forum, then basically you're putting the transit authorities to exactly the choice that layman said the Constitution doesn't put them to. What layman said is you don't have to decide that in order to avoid the harms that you perceive from running every kind of ad without making these categorical judgments, you don't have to decide either I'm going to endure those harms in order to gain the revenue to offset the cost of running a transit system or I'm going to shut down the forum entirely because those harms are too great to bear. But I respectfully suggest that is what viewing this as a designated public forum would bring about. That is what accepting my friend's understanding of what viewpoint discrimination would bring about. And I just don't think that the court can do that consistent with layman. Thank you. Thank you. Counsel for Appellant will give you some time given time. Your colleague, Ed. Thank you, Your Honor. I'll try to be brief with a few points in rebuttal. First of all, I do think in considering the specific issue before the court, whether to issue a preliminary injunction while the rest of this litigation proceeds, it is important to recognize that my friend on the other side quite correctly conceded this is a benign ad. So you can allow this benign ad to run while the rest of this litigation proceeds, and we have gotten through this whole hour and we haven't even talked about whether RFRA applies to WMATA. There's lots of issues for the lower court to wade through. The question here is what's going to be the status quo while the litigation proceeds? Pro-First Amendment, anti-First Amendment, and I would submit the fact that this is a conceitedly benign ad goes a long way to saying the status quo while the litigation proceeds is let the benign ad run next Advent season, Advent season 2018. The only reason they can say this is not a benign ad is because if you run this, they submit, then you have to run the ad on JA-268. They're wrong about that. The ad on JA-268 is an issue ad. They don't need Guideline 12 to ban that ad, and that's the difference. They needed Guideline 12 to ban this ad. They needed Guideline 12 to ban Walk with Francis. Those are not issue ads. The only reason they banned them is because of Guideline 12. Another point just to keep in mind, my friend on the other side raises the Cornelius case. Cornelius is another example where the government treated political speech differently from religious speech. You can go to the Campaign for Federal Giving and you can find all sorts of religious charities, but politics is different. That's why there's just no case they have that says the government can do what Guideline 12 does. Lehman didn't do it. They allowed church ads. Cornelius didn't do it. They allowed religious charities. Nobody did it, but there are three cases that deal with something directly analogous to Guideline 12. They're Lamb's Chapel, Good News in Rosenberg, and in each one of those, it's the speech that the person chose that defined the topic, and if it was otherwise within the forum, then if it was excluded only because of something like Guideline 12, it was unconstitutional. There's no question. I mean, if you say that Guideline 12 is unconstitutional, then they can decide what else is in the forum by administering the other 13 guidelines. They don't need Guideline 12, and the Constitution doesn't permit them to have it. Thank you, Your Honor. Thank you. We'll take the case under review. Thank you. Good-bye. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Rogers, Kavanaugh, Wilkins